IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GARY OLIPHANT, | ) | |
| Plaintiff, | ) | |
| v. | ) | 09 C 3876 |
| | ) | |
| | ) | Judge Virginia M. Kendall |
| COOK COUNTY DEPARTMENT OF | ) | |
| CORRECTIONS, et al., | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Gary Oliphant brings this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 alleging that the Cook County Department of Corrections, Aramark Food Services, Inc., Doctor Ann Dunlap, Physician's Assistant Manisha Patel, and Nurse Carreen McGhee were deliberately indifferent to his medical and dietary needs while he was a pre-trial detainee at the Cook County Jail in violation of his Fourteenth Amendment right to due process of law.[1] Oliphant brings the remaining allegations in his suit against the named Defendants solely in their individual capacities. The Defendants respond that they were not deliberately indifferent to Oliphant's medical and dietary needs, that he did not have any objectively serious medical conditions that went untreated, and that they had no personal involvement in any alleged constitutional violation. The parties filed cross motions for summary judgment. For the reasons set forth, Oliphant's Motion for Summary Judgment is denied and Defendants' Joint Motion for Summary Judgment is granted.

## I. The Material Undisputed Facts

---

[1] The Cook County Department of Corrections was dismissed as a Defendant in this suit by this Court on March 31, 2010 because the Cook County Department of Corrections is not an entity subject to liability. *See Castillo v. Cook County Mail Room Dept.*, 990 F.2d 304, 307 (7th Cir. 1993). Aramark and Oliphant settled their dispute and pursuant to a stipulation of the parties, the claims against Aramark were dismissed by this Court with prejudice on April 14, 2011.

Each of the parties has moved for summary judgment. Therefore, Oliphant submitted a Statement of Undisputed Material Facts in support of his Motion for Summary Judgment as well as a response to the Defendants' Statement of Undisputed Material Facts. As a threshold matter, Oliphant failed to comply with the Northern District of Illinois' Local Rule 56.1, which prescribes the manner for submitting a party's statement of undisputed material facts in support of a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, as well as the manner for responding to the opposing party's statement of material facts and submitting additional facts that the nonmoving party contends require the denial of summary judgment. *See* L.R. 56.1(a)(3), (b)(3), (b)(3)(C). District courts have broad discretion to enforce strict compliance with Local Rule 56.1—indeed they are encouraged to do so. *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382 n.2; *F.T.C. v. Bay Area Business Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005) (collecting cases); *Koszola v. Bd. of Educ. of the City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon*, 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (collecting cases)).

Although the filings of *pro se* litigants are subject to more liberal review and interpretation, a *pro se* plaintiff must still comply with the governing local rules of procedure. *See Dale v. Poston* 548 F.3d 563, 568 (7th Cir. 2008) ("Judges, of course, must construe *pro se* pleadings liberally. But procedural rules cannot be ignored.) (internal citations omitted); *Greer v. Bd. of Educ.*, 267 F.3d 723, 727 (7th Cir. 2001) (a *pro se* plaintiff's failure to comply with Local Rule 56.1 is not excused by the rule that courts should construe the pleadings of *pro se* plaintiffs liberally). Oliphant's Local Rule 56.1(a)(3) Statement of Undisputed Material Facts in support of summary judgment fails to city any record evidence in support of his factual assertions. Pursuant to Local Rule 56.1, a party's

statement of facts submitted to the Court is to comprise "short numbered paragraphs with citations to admissible evidence." *Smith v. Lamz*, 321 F.3d 680, 682 (7th Cir. 2003). The local rules governing summary judgment "assist the court by organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side proposed to prove a disputed fact with admissible evidence." *See Markham v. White*, 172 F.3d 486, 490 (7th Cir. 1999). Under Local Rule 56.1 it is improper for a party to include legal or factual conclusions, arguments, or conjecture in a statement of undisputed material facts or in a response to a statement of undisputed material facts. *See Judson Atkinson Candies, Inc.*, 529 F.3d 371 at 382 n.2; *Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) (a party's statement of undisputed material facts submitted pursuant to Local Rule 56.1 is improper where it fails to cite to the record and is "filled with irrelevant information, legal arguments, and conjecture."). Oliphant cites no record evidence in support of his assertions and many of his assertions comprise nothing more than legal conclusions.[2] As a result, the Court must disregard his statement of undisputed material facts. *See Bay Area Business Council, Inc.*, 423 F.3d at 633.

Oliphant's response to the Defendants' Statement of Undisputed Material Facts in support of their Motion for Summary Judgment is equally problematic. The Local Rules make special

---

[2]For example, Oliphant's second statement of fact states: "Gary Oliphant had the right to proper medical care." This statements is a legal conclusion and is improper in a statement of undisputed material facts. *See Cady*, 467 F.3d at 1060 (a party's statement of undisputed material facts submitted pursuant to Local Rule 56.1 is improper where it fails to cite to the record and is "filled with irrelevant information, legal arguments, and conjecture.") Oliphant's tenth statement of fact states: "The Defendant Manisha Patel signed and promised the defendant a diet code Q for his heart condition." This factual averment does not cite to any evidence to support its veracity, and it is therefore improper. *See Smith*, 321 F.3d at 682. All of Oliphant's statements of undisputed material facts are either impermissible legal arguments or conjecture and all are unsupported by any record evidence—let alone admissible evidence.

provision for notice to *pro se* litigants opposing motions for summary judgment by requiring the moving party to issue a letter with their motion for summary judgment describing the proper manner for responding in opposition to the motion. *See* L.R. 56.2. Defendants sent a Rule 56.2 letter to Oliphant with their Motion for Summary Judgment. When a *pro se* litigant is provided with a Rule 56.2 letter he is presumed to be on notice of his obligations under Rule 56.1 and failure to comply with that Rule will result in the admission of the moving party's facts. *See Gleash v. Yuswak*, 308 F.3d 758, 761 (7th Cir. 2002).

In response to Defendants' Motion for Summary Judgment, Oliphant filed two documents. One is a single page document titled "Response to Summary Judgment, Defendants" (Doc. 115), which appears to be intended as Oliphant's response to the Defendants' Local Rule 56.1(a)(3) Statement of Undisputed Material Facts in support of their Motion. The second document is titled "Response to Motion for Summary Judgment By Defendants Motion Received on May 5, 2012" (Doc. 116), which appears to be Oliphant's memorandum of law in response to the Defendants' Motion for Summary Judgment. In Doc. 115, Oliphant states that he agrees with paragraphs 1 and 2; denies none of the Defendants' facts; and fails to respond to most of the Defendants' facts. He explicitly addresses paragraph 3, to which he says he has no response; paragraph 4, to which he simply directs the Court to exhibits A through I; paragraph 5, to which he again directs the Court to consult the attached exhibits; and paragraph 6, to which Oliphant responds that the reason the Defendants have filed a motion for summary judgment is "still unclear." Oliphant fails to make "a concise response to the movant's statement that...contain[s] numbered paragraphs, each corresponding to and stating a concise summary of the paragraph to which it is directed." L.R. 56.1(b)(3)(A). He further runs afoul of the Rule because he does not offer "a response to *each*

4

numbered paragraph in the moving party's statement, including, in the case of any disagreement, *specific* references to the affidavits, parts of the record, and other supporting material relied upon." L.R. 56.1(b)(3)(B) (emphasis supplied). An adequate denial of a statement of fact must specifically admit or deny the relevant fact, cite to facts in support of the denial, and cite to specific references in an affidavit or other parts of the record that supports such a denial. *See Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817 (7th Cir. 2004). Furthermore, the nonmoving party may not simply direct the Court to consult exhibits; this Court is not obligated in our adversary system of justice to scour the record looking for factual disputes to defeat a proper motion for summary judgment. *See Waldridge v. American Hoechst Corp.*, 24 F. 918, 922 (7th Cir. 1994). Therefore, Oliphant's response to the Defendants' Local Rule 56.1 Statement of Undisputed Material Facts is insufficient and is stricken by the Court. Rule 56.1 provides that "[a]ll material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." *See* L.R. 56.1(b)(3)(C). Because Oliphant has not controverted the Defendants' Statement of Undisputed Material Facts in support of their Motion the Defendants' facts are deemed admitted.

In Doc. 116 it is unclear whether Oliphant is trying to allege additional statements of material fact that require the denial of summary judgment pursuant to Local Rule 56.1(b)(3)(C) or is merely providing a memorandum of law in support of his Motion. If Oliphant is attempting to introduce additional facts, he has done so improperly. The facts—if that is what they are—are a narrative recitation, full of legal conclusions and improper argument. Local Rule 56.1(b)(3)(C) mandates that "any additional facts that require the denial of summary judgment" must be included in a separate "statement, consisting of short numbered paragraphs. . ." When the nonmoving party fails to comply

5

with Local Rule 56.1(b)(3)(C) by failing to submit any additional facts in a separate statement and by failing to support the facts with admissible record evidence it is proper for the Court to strike the additional facts. *See Chichon v. Exelon Generation Co., LLC,* 401 F.3d 803, 808 (7th Cir. 2005). It is not even clear whether Oliphant intended the statements in Doc. 116 to constitute an additional statement of material facts that requires the denial of summary judgment. To the extent that he did, they are stricken by the Court as improper.

Oliphant was a detainee at the Cook County Jail from July 7, 2008, through December 17, 2008. (Def. 56.1 SOF ¶ 2). Cermak Health Services ("Cermak") provides health care for detainees at the Cook County Jail. (*Id.* ¶ 3). Dr. Ann Marie Dunlap is a physician licensed to practice in the State of Illinois and from July 2008 through December 2008 was employed by Cermak as an Internist in Division 10 of the Cook County Jail. (*Id.* ¶ 4). Dunlap did not have any administrative or supervisory duties in her role at Cermak. (*Id.*). Careen McGhee is a licensed nurse in the State of Illinois and has been employed by Cermak as a nurse since 1998. (*Id.* ¶ 5). Manisha Patel is a licensed Physician's Assistant and has been employed by Cermak as a Physician's Assistant since 2003. (*Id.* ¶ 6).

Oliphant has problems with his heart. (*Id.* ¶ 9). He had a pacemaker/defibrillator implanted when he was at the Illinois Department of Corrections in 2005. (*Id.*). Oliphant experiences regular treatments from his pacemaker, which paces his heart, and which he can sometimes feel like an electroshock. (*Id.* ¶ 10). Oliphant stated that he probably had three or four treatments while sitting for his deposition because they happen all the time. (*Id.*). The treatments are something Oliphant feels often, particularly when he feels nervous or anxious, or when he is doing something strenuous. (*Id.* ¶ 11). If it is serious enough that he gets a defibrillator shock, Oliphant is supposed to go

straight to a doctor; otherwise he just takes it easy until his heart gets back to normal. (*Id*. ¶ 12). Oliphant testified that what led to the damage to his heart and resulted in his getting a pacemaker/defibrillator was a reaction to a very high level of chemicals in soy food. (*Id*. ¶ 13). Oliphant testified that he never had been to a doctor or had any health issues before he went to the Illinois Department of Corrections. (*Id*.).

Oliphant claims that Patel was deliberately indifferent because she did not follow up with Aramark about getting Oliphant a low cholesterol diet. (*Id*. ¶ 14). Aramark was the food service provider while Oliphant was in the Cook County Jail and was contracted by the Cook County Department of Corrections. (*Id*. ¶ 15). Avery S. Hart, M.D., is the Chief Medical officer at Cermak and, in that capacity, is familiar with the process for providing special diets for detainees with special medical needs at the Cook County Department of Corrections. (*Id*. ¶ 17). When a physician at Cermak determines that a detainee in the Cook County Jail requires a special diet for medical reasons, the physician writes an order for the diet. (*Id*. ¶ 18). In 2008, orders for special diets were written on a form known as a "Restricted Diet Order Form," provided by the Cook County Department of Corrections. (*Id*.). The special diet order was then either faxed to the central kitchen or entered directly into the electronic information system of the Cook County Department of Corrections by an Administrative Aid at Cermak. (*Id*. ¶ 19). Physicians or physician's assistants would not have been responsible for this part of the process. (*Id*.). Cermak is not actually involved in providing meals for detainees at the Cook County Department of Corrections. (*Id*. ¶ 20).

During the period of July through December 2008, Patel was assigned to Division 10 at Cermak and her duties consisted of examining, testing, diagnosing, and treating detainees for medical problems under the supervision of a physician. (*Id*. ¶ 21). Oliphant was seen at Cermak

on August 14, 2008, and Patel signed a Restricted Diet Order Form to order a low cholesterol diet for Oliphant on that date. (*Id*. ¶ 22). Patel would not have had any way of knowing whether or not Oliphant was actually served a low cholesterol diet while he was incarcerated at the Jail. (*Id*. ¶ 23). Oliphant admits that he does not know if Patel had any responsibility for calling Aramark. (*Id*. ¶ 24). After Oliphant told staff at the Cook County Jail that he was not getting a low cholesterol diet, he was told by the staff to notify a counselor in his Unit, which he did. (*Id*. ¶ 25). The Progress Notes from Oliphant's medical records reflect that he was seen at Cermak on November 26, 2008, after results had been received from a cholesterol test that had been done after his last visit to Cermak and that a low cholesterol diet was ordered for Oliphant. (*Id*. ¶ 26). During the November 26, 2008 visit Oliphant addressed that fact that he was not receiving a low cholesterol diet with Patel and she signed another Restricted Diet Order Form to reorder the low cholesterol diet. (*Id*. ¶ 27). A follow-up visit was scheduled at Cermak for December 24, 2008. (*Id*. ¶ 28). Oliphant was not seen at Cermak on December 24, 2008, because he was discharged from the Cook County Jail on December 17, 2008. (*Id*. ¶ 29).

Oliphant learned that he had high cholesterol levels after leaving the Cook County Jail. (*Id*. ¶ 30). Oliphant did not get a low cholesterol diet while he was at the Illinois Department of Corrections from 2008 to 2010 after leaving the Cook County Jail. (*Id*. ¶ 31). Although Oliphant was asked in interrogatories to describe how he was adversely affected as a result of not receiving a low cholesterol diet while at the Cook County Jail, he answered only that it was under evaluation by a medical doctor. (*Id*. ¶ 32). Oliphant testified that the reports he identified in his answers to interrogatories were not available when he answered the interrogatories and that they would not be until he got a doctor. (*Id*. ¶ 33).

8

Oliphant testified that he injured his finger while at the Cook County Jail in October 2008, when someone threw a football at him during recreational time. (*Id*. ¶ 34). Oliphant reported his injury to the officer on duty, Officer Ochoa, who sent him straight to the Emergency Room at Cermak. (*Id*. ¶ 35). The Emergency Room Record of Oliphant's visit reflects that on October 13, 2008, Oliphant was taken to the Emergency Room, complaining of an injury to his right 5th finger after somebody stepped on it. (*Id*. ¶ 36). At the Emergency Room, Nurse Judith Noble triaged Oliphant and he was examined by Dr. Sunita Williamson. (*Id*.). Williamson pulled Oliphant's finger straight and put it in a splint and told him that he would need to see a specialist. (*Id*. ¶ 37). Oliphant was also given some medication for his pain. (*Id*.). An x-ray was taken of Oliphant's finger at that time and the Radiology Report revealed an impression of a normal little right finger, with no fractures or bone pathology. (*Id*. ¶ 38).

Oliphant was given a referral to the Orthopedic Clinic by Williamson, the treating physician, where he was seen on October 30, 2008, by Dr. Kapotas. (*Id*. ¶ 39). In the event that a referral of a detainee to the Orthopedic Clinic is made by a physician or a physician's assistant in the Emergency Room, that referral is reflected in the detainee's medical chart. (*Id*. ¶ 40). In 2008, a Movement Card reflecting the appointment with a clinic was also prepared and given to Oliphant, with the instruction that he give the Movement Card to the officer on duty during the shift corresponding to the time of the appointment so that Oilphant would be taken to the appointment on the designated date by Sheriff's personnel at the Cook County Jail. (*Id*. ¶ 41). Any follow-up visits to the Orthopedic Clinic, either because an appointment was missed or because a physician in the Clinic requested a follow-up, would have been scheduled by the Scheduling Department of Cermak, and Emergency Room personnel would not have been involved in that process. (*Id*. ¶ 42).

9

Oliphant was originally scheduled to see a doctor in the Orthopedic Clinic at Cermak on October 15, 2008. (*Id.* ¶ 43). The Orthopedic Clinic is located at Cermak and is staffed by orthopedic specialists from Stronger Hospital. (*Id.* ¶ 44). It is operated on Wednesday and Thursday evenings from 5:00 p.m. to 6:00 p.m. (*Id.*). If for some reason Oliphant was not seen in the Orthopedic Clinic on the date of his appointment, Emergency Personnel would not have been made aware of this. (*Id.* ¶ 45). The record of Oliphant's visit to the Orthopedic Clinic indicate that he presented with an injury to the right phalanx, his pinky finger, that it was tender over the distal phalanx, that the nerves were intact, that he was able to flex the digital and phalangeal, and that an x-ray indicated no fracture. (*Id.* ¶ 46). Other than some tenderness in the finger, Kapotas did not note any problems with the finger. (*Id.*). The finger was taped and it was recommended that Oliphant do range of movement exercises. (*Id.*). Oliphant was also seen by other physicians at Cermak after October 30, 2008. (*Id.* ¶ 47).

Oliphant stated in his deposition that Dunlap told him on October 21, 2008 that he was scheduled for surgery, which was before Oliphant saw the orthopedic doctor. (*Id.* ¶ 48). Oliphant claims that Dunlap acted with deliberate indifference because she told him that he was scheduled for surgery. (*Id.* ¶ 49). Oliphant admitted that Dunlap was not the doctor who saw him in the Emergency Room, that she was not the orthopedic doctor he saw, nor was she the doctor treating him for his hand. (*Id.* ¶ 50). Dunlap did not have any administrative or supervisory duties. (*Id.* ¶ 51). Oliphant admitted that nobody else told him that he was scheduled for surgery and that he was not told when the surgery would be scheduled for or how long of a wait it would be. (*Id.* ¶ 52). Oliphant admitted that the orthopedic doctor, the doctor who was actually treating him, did not tell him he was scheduled for surgery. (*Id.* ¶ 53).

10

Oliphant also claims that McGhee was deliberately indifferent with respect to his finger injury because he was not seen in the Orthopedic Clinic on October 15, 2008, as originally scheduled. (*Id.* ¶ 54). During 2008, McGhee was assigned to the Emergency Room at Cermak and her duties consisted of triaging detainees who were brought to the Emergency Room, doing paperwork in connection with detainee visits to the Emergency Room, and providing initial doses of medication that was prescribed by a doctor or physician's assistant in the Emergency Room. (*Id.* ¶ 55). McGhee wrote the Movement Card for the transfer of Oliphant to the Orthopedic Clinic, which reflects that an appointment had been scheduled for October 15, 2008, the Wednesday after the Monday Oliphant was seen in the Emergency Room. (*Id.* ¶ 56). Based on her experience working in the Emergency Room, the fact that McGhee wrote the Movement Card was likely because she prepared the discharge paperwork for Oliphant for his visit to the Emergency Room on October 13, 2008. (*Id.* ¶ 57). Other than scheduling the Orthopedic Clinic visit for Oliphant following his visit to the Emergency Room, McGhee was not involved in Oliphant's medical care or treatment during his detention at the Cook County Jail from July through December 2008. (*Id.* ¶ 58).

Oliphant testified that after he left the Cook County Jail on December 17, 2008 he told the intake doctor at the Illinois Department of Corrections about his hand during his intake physical, but that they were not concerned about it. (*Id.* ¶ 59). Oliphant did not receive any treatment for his hand while at the Illinois Department of Corrections from December 2008 to approximately October 2010. (*Id.* ¶ 60). Oliphant has not seen a doctor in regard to his hand since the time he was in the Illinois Department of Corrections. (*Id.* ¶ 61). The doctors that Oliphant has seen since leaving the Illinois Department of Corrections have been for his heart condition and treatment. (*Id.* ¶ 62).

11

Other than the dates identified in Oliphant's Complaint, he admitted that he otherwise received his medication. (*Id.* ¶ 63). Oliphant testified that when he went to the Illinois Department of Corrections he had medication left over from the Cook County Jail, which he flushed down the toilet. (*Id.* ¶ 64). Oliphant is estimating his damages in this case to be $1,186,999.00 based on medical bills he received from Northwestern Hospital in relation to his heart treatment and condition and all the treatment he had while he was at the Illinois Department of Corrections from 2005 to 2007, before he was at the Cook County Jail. (*Id.* ¶ 65).

## II. The Standard of Review

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Omnicare Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 704 (7th Cir. 2011); *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). When a case comes before the Court on cross-motions for summary judgment, the Court must look to the burden of proof that each party would bear on an issue at trial and then require that party to go beyond the pleadings and establish through competent evidence a genuine issue of material fact. *See Santella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997) (citing *Celotex*, 477 U.S. at 324).

### III. Discussion

A pre-trial detainee's right to be provided adequate medical care by those whose custody he is in is guaranteed by the Fourteenth Amendment's Due Process Clause. *See Williams v Rodriguez*, 509 F.3d 392, 401 (7th Cir. 2007); *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001). In evaluating a claim of deliberate indifference to a pre-trial detainee's medical care the Court applies the same standard as that which is applicable to prisoners under the Eighth Amendment's guarantee of freedom from cruel and unusual punishment. *See Chapman*, 241 F.3d at 845. To establish a case of deliberate indifference a plaintiff must prove that each defendant displayed deliberate indifference to his serious medical needs. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The *Estelle* standard for claims of deliberate indifference contains both a subjective and an objective element. *See Gutierrez v. Peters*, 111 F.3d 1368, 1369 (7th Cir. 1997). First, the plaintiff must produce enough evidence to prove that he objectively suffered from a serious medical condition. *See Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008). An objectively serious medical condition is one that has been diagnosed by a physician as requiring treatment or that would be so obvious that a lay person would immediately perceive of the need for a doctor's attention. *See Chapman*, 241 F.3d at 845 (quoting *Zentmyer v. Kendall County*, 220 F.3d 805, 810 (7th Cir. 2000)). Second, the plaintiff must prove that the defendants subjectively knew of the serious medical condition but intentionally or recklessly disregarded it. *See Hayes*, 546 F.3d at 523. The plaintiff must show both that the defendants were aware of the fact from which the inference could be drawn that a substantial risk of harm exists and they must actually draw that inference. *See Higgins v. Correctional Medical Services*, 178 F.3d 508, 511 (7th Cir. 1999).

13

The exercise by a physician of his professional judgment does not constitute deliberate indifference. *See Youngberg v.. Romeo*, 457 U.S. 307, 322-323 (1982). Medical decisions, such as whether one course of medical conduct is preferable over another, are beyond the protections afforded by the Eighth Amendment. Similarly, claims of medical malpractice do not arise to deliberate indifference and the Eighth Amendment is not a vehicle for bringing claims of medical malpractice. *See Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008); *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996). Indifference to a serious medical need is not demonstrated by pure negligence or even a series of negligent acts. *See Guzman v. Sheehan*, 495 F.3d 852, 857 (7th Cir. 2007); *Sellers v. Henman*, 41 F.3d 1100, 1102-1103 (7th Cir. 1994). The standard requires a showing of conduct comparable to criminal recklessness. *See King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012). Further, the Eighth Amendment does not entitle a detainee to unqualified access to healthcare. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992). A detainee has the right to medical care, but he does not have the right to determine the type of medical care he receives. Inmates are entitled only to adequate medical care. *See Boyce v. Moore*, 314 F.3d 884, 888-89 (7th Cir. 2002). Also, the Constitution does not entitle an inmate to demand specific or specialized care. A difference of medical judgment between a doctor and an inmate does not give rise to an actionable constitutional tort under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983. In addition, when a plaintiff alleges that deliberate indifference was manifested through a delay in receiving medical treatment, rather than by the treatment itself, he must present sufficient evidence establishing the detrimental effect and injury that resulted from the delay. *See Langston v. Peters*, 100 F.3d 1235, 1240-1241 (7th Cir. 1996).

Here, Oliphant has sued the Defendants solely in their individual capacities. It is long-established that personal involvement by the relevant defendant is a prerequisite to imposing individual liability under 42 U.S.C. § 1983. *See Munson v. Gaetz*, 673 F.3d 630, 637 (7th Cir. 2012); *Sanville v. McCaughtry,* 266 F.3d 724, 739 (7th Cir. 2001); *Gossmeyer v. McDonald*, 128 F.3d 481, 495 (7th Cir. 1997); *Wolfe-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983). An individual cannot be held liable in a cause of action under 42 U.S.C. § 1983 unless he caused or participated in the alleged constitutional violation. *See Jenkins v. Keating*, 147 F.3d 577, 583 (7th Cir. 1998). A defendant is only liable for the constitutional violation he perpetrated on the plaintiff. *See Munson*, 673 F.3d at 637. A jail has the right to divide tasks among different officials, and a detainee cannot demand that one employee intervenes on his behalf when a second employee is responsible for that task. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). To prevail against each of the individually named Defendants, Oliphant must prove that each is personally liable for deliberate indifference to an objectively serious medical condition.

Oliphant claims that Physician's Assistant Manisha Patel was deliberately indifferent to his medical needs because he did not receive a low cholesterol diet during his detention at the Cook County Jail. Oliphant has not alleged that any of the other Defendants are responsible for failing to provide him with a low cholesterol diet. Cermak is not involved in providing meals to detainees at the Cook County Jail. Aramark was the food service provider while Oliphant was detained and was contracted by the Cook County Department of Corrections. During the period of July through December 2008, Patel was assigned to Division 10 at Cermak. Oliphant was seen at Cermak on August 14, 2008, and Patel signed a Restricted Diet Order Form to order Oliphant a low cholesterol diet on that date. Patel did not have any way of knowing whether or not Oliphant was in fact served

a low cholesterol diet while detained at the Cook County Jail. Furthermore, Oliphant admits that he does not know if Patel had any responsibility for calling Aramark. After Oliphant told staff at the Jail that he was not receiving a low cholesterol diet, he was told to notify a counselor in his unit at the Jail, which he did.

Oliphant was again seen at Cermak on November 26, 2008. The Progress Notes from Oliphant's medical records reflects that results had been received from a cholesterol test that had been done after his last visit to Cermak and that a low cholesterol diet had been ordered for him. During the November 26, 2008 visit Oliphant addressed the fact that he was not receiving a low cholesterol diet with Patel, and she signed another Restricted Diet Order Form to reorder the low cholesterol diet. A follow-up visit at Cermak was scheduled for Oliphant for December 24, 2008, but the visit never occurred because by that date Oliphant had been discharged from the Cook County Jail.

The undisputed facts in the record establish that during Oliphant's five-month detention at the Cook County Jail Patel twice submitted a request for a low cholesterol diet on Oliphant's behalf. The record also establishes that neither Patel nor Cermak were responsible for, or actually involved in, providing meals to detainees at the Cook County Department of Corrections. The undisputed facts also show that Patel was not responsible for determining if the Cook County Jail, through its contractor Aramark, was providing the requested diet. The Cook County Jail is under the exclusive control of the Sheriff of Cook County. *See Thompson v. Duke*, 882 F.2d 1180, 1187 (7th Cir. 1989). Therefore, Patel cannot be held individually liable for deliberate indifference in violation of the Fourteenth Amendment for Oliphant's failure to receive a low cholesterol diet. *See, e.g., Dolis v. Loftus*, No. 08 C 2085, 2011 WL 978916, *16 (C.D. Ill. March 17, 2011) (individual doctor and

16

health care clinic were not deliberately indifferent with respect to plaintiff's claim that he was injured by a soy diet where the doctor did not have the authority to alter the soy content of the diet received and the health care clinic was not responsible for creating or preparing the diet provided to inmates).

Oliphant can also not establish that his failure to receive a low cholesterol diet resulted in an objectively serious medical condition. Oliphant testified that he learned that he had high cholesterol levels after leaving the Cook County Jail. Furthermore, Oliphant did not get a low cholesterol diet while he was incarcerated at the Illinois Department of Corrections from 2008 to 2010 after leaving the Cook County Jail. When asked to describe how he was adversely affected as a result of not receiving a low cholesterol diet while at the Jail, Oliphant responded in answers to interrogatories only that it was under evaluation by a medical doctor. At his deposition Oliphant testified that the reports he identified in his answers to interrogatories were not available when he answered the interrogatories and that they would not be available until he got a doctor. Oliphant was not able to provide any further support for his claims. Oliphant has failed to submit any evidence showing that he was injured by his failure to receive a low cholesterol diet while he was a detainee at the Cook County Jail for five months. Oliphant is unable to demonstrate that his failure to receive a low cholesterol diet resulted in an objectively serious medical condition and he therefore cannot establish that Patel was deliberately indifferent to his medical needs. Therefore, Patel is entitled to judgment as a matter of law on this portion of Oliphant's claims.

Oliphant also claims that the Defendants were deliberately indifferent to an injury that he sustained to his right pinky finger. Although Oliphant was treated for his finger injury, he alleges that the Defendants were deliberately indifferent to his medical needs by failing to provide him with

17

hand surgery.  Oliphant reported the injury to his hand to the officer on duty, who sent him straight to the Emergency Room at Cermak.  Nurse Noble triaged Oliphant and he was treated by Dr. Williamson.  Williamson pulled Oliphant's finger straight and put it in a splint.  An x-ray was taken of Oliphant's finger at that time and the Radiology Report revealed an impression of a normal little right finger with no fractures or bone pathology.  Williamson then referred Oliphant to an orthopedic specialist.  Oliphant was seen by Dr. Kapotas at the Orthopedic Clinic on October 30, 2008.  The record of Oliphant's visit to the Orthopedic Clinic indicates that he presented with an injury to the right phalanx, his pinky finger, that it was tender over the distal phalanx, that the nerves were intact, that Oliphant was able to flex the digital and phalangeal, and that an x-ray indicated no fracture. Other than some tenderness in the finger, Kapotas did not note any problems with the finger.  The finger was taped and it was recommended that Oliphant do range of movement exercises.  Oliphant was also seen by other physicians at Cermak after October 30, 2008.  He did not receive any treatment for his hand while at the Illinois Department of Corrections from December 2008 to approximately October 2010.  Furthermore, Oliphant has not seen a doctor in regard to his hand since the time he was in the Illinois Department of Corrections.  The undisputed evidence in this case reveals that Oliphant has failed to establish that the injury to his finger resulted in an objectively serious medical condition for which he went untreated.

Oliphant contends that Dr. Ann Dunlap was deliberately indifferent to his finger injury because she told him on October 21, 2008 that he was scheduled for surgery.  This was before he saw the orthopedic specialist.  Furthermore, Oliphant admitted that Dunlap was not the doctor who saw him in the Emergency Room and that she was not the orthopedic specialist that he saw, or the doctor treating him for his hand.  Oliphant's claim that surgery was required to repair his injured

18

finger is unsupported by any evidence in the record. To make out a claim of deliberate indifference it is not enough to show that a doctor should have known surgery was necessary; the plaintiff must instead show that the doctor knew surgery was necessary and then consciously disregarded this fact. *See Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). Oliphant further admitted that nobody else told him that he was scheduled for surgery and that he was not told when the surgery would be scheduled for, or how long a wait it would be. He further admitted that the orthopedic specialist actually treating him did not tell him he was scheduled for surgery. Even if Dunlap had been one of Oliphant's treating physicians with respect to his finger injury, none of the physicians or the orthopaedic specialist treating Oliphant, including after his discharge from the Cook County Jail, diagnosed any condition necessitating surgery or recommended surgery, let alone opined that surgery was necessary at the time of Oliphant's injury.

The undisputed evidence in the record establishes that Oliphant was taken to the Emergency Room and treated immediately after his injury, including having an x-ray taken that revealed no fracture to his finger. It further establishes that Oliphant was examined by an orthopedic specialist approximately two weeks later, who found nothing wrong with Oliphant's finger, re-taped it and recommended range of movement exercises. The record also establishes that Dunlap is not an orthopedic specialist and did not examine or treat Oliphant with respect to his finger injury, much less fail to follow the advice of any specialists who were treating Oliphant. Oliphant therefore cannot establish that Dunlap had any personal involvement in any alleged constitutional deprivation, or that she was deliberately indifferent to any objectively serious medical condition in relation to Oliphant's finger. Thus, Dunlap is entitled to judgment as a matter of law in her favor on Oliphant's claim that she was deliberately indifferent to his medical needs by telling him that he was scheduled

for surgery. The Defendants are also entitled to judgment as a matter of law in their favor on Oliphant's claim that they acted with deliberate indifference to his medical condition by failing to provide him with hand surgery.

Oliphant next contends that Nurse Careen McGhee was deliberately indifferent in connection with his finger injury because he was not seen in the Orthopedic Clinic on October 15, 2008, as originally scheduled. McGhee wrote the Movement Card relating to Oliphant's appointment with the Orthopedic Clinic, which reflects that an appointment was scheduled for October 15, 2008. Other than scheduling the Orthopedic Clinic appointment for Oliphant after his visit to the Emergency Room McGhee was not involved in Olphant's medical care or treatment during his detention at the Cook County Jail. Oliphant was immediately treated after sustaining the injury to his finger and an appointment was made for him to be seen in the Orthopedic Clinic two days after his visit to the Emergency Room. The undisputed evidence in this case establishes that McGhee did not examine Oliphant in the Emergency Room and had no other involvement in his treatment other than to fill out the appointment card for his visit to the Orthopedic Clinic. Furthermore, the record shows that Cook County Jail personnel were responsible for transporting Oliphant to his orthopedic appointment and that McGhee would not have been aware of whether or not he was taken to the appointment. The evidence also shows that Oliphant was seen by a specialist in the Orthopedic Clinic two weeks after his visit to the Emergency Room on October 13, 2008. Oliphant has thus failed to show that McGhee had any personal involvement in any alleged constitutional depravation, or that she was deliberately indifferent to any objectively serious medical condition with respect to Oliphant's finger.

Even if McGhee was responsible for getting Oliphant to his orthopedic appointment, slight delays in treatment will not result in a finding of deliberate indifference. *See Walker v. Peters*, 233 F.3d 494, 502 (7th Cir. 2000) (incidents of delay in administering clotting protein for a prisoner's hemophilia does not constitute deliberate indifference given the totality of the care the prisoner receives). The record does not establish that Oliphant had an objectively serious medical condition. Given the fact that Oliphant was treated by an orthopedic specialist who examined his finger and did not find any problems with it, Oliphant cannot establish that a dely of two weeks caused any injury to him and therefore cannot state a claim for deliberate indifference on the basis of delay. *See Langston*, 100 F.3d at 1240-1241 (to state a claim for deliberate indifference on the basis of delay, rather than treatment, a plaintiff must provide evidence to show that the delay resulted in further injury). Therefore, McGhee is entitled to judgment as a matter of law in her favor on Oliphant's claim that she was deliberately indifferent to his medical needs because he was not seen at the Orthopedic Clinic on October 15, 2008, as originally scheduled.

Oliphant also argues that the Defendants were deliberately indifferent towards him by failing to provide him with his medication on specific dates. Taking the facts alleged in Oliphant's amended Complaint as true,[3] Oliphant did not receive his medication on July 10, 2008, July 14, 2008, July 27, 2008, and August 3, 2008. Other than on those specific dates Oliphant received his medication. Oliphant testified that when he went to the Illinois Department of Corrections he had medication left over from the Cook County Jail, which he flushed down the toilet. Isolated occasions of a failure to receive treatment will not result in a finding of deliberate indifference. *See*

---

[3]The Defendants do not dispute that Oliphant did not in fact receive his medication on the dates alleged in his Complaint.

*Gutierrez*, 111 F.3d at 1375. There is no evidence in the record that Oliphant suffered any injury as a result of his failure to receive certain medications during his five-month detention at the Jail. This precludes a finding of deliberate indifference. *See Walker*, 233 F.3d at 502.

More fatal to Oliphant's claim of deliberate indifference resulting from not receiving medication on certain dates is the fact that none of the Defendants was responsible for providing him with his medication on a daily basis or upon his intake. To establish a case of deliberate indifference pursuant to 42 U.S.C. § 1983 Oliphant must establish that each of the individually named Defendants was personally responsible for the constitutional violation alleged. *See Antonelli v. Sheahan*, 81 F.3d 1422, 1428 (7th Cir. 1995). Because none of the Defendants were personally responsible for administering Oliphant's medication, and because Oliphant has introduced no evidence to demonstrate that any of the Defendants were personally involved in dispensing his medication, his claim of deliberate indifference must fail. Furthermore, Oliphant cannot show that the Defendants acted with deliberate indifference to an objectively serious medical need by failing to provide him with medication on certain isolated dates. Oliphant suffered no harm from failing to receive medication on a few isolated occasions. Therefore, the Defendants are entitled to judgment as a matter of law on Oliphant's claim relating to his failure to receive medication on certain specified days while he was in custody at the Cook County Jail.

There is no evidence in the record that Oliphant suffered from an objectively serious medical condition that went untreated. Oliphant's failure to receive a low cholesterol diet does not constitute an objectively serious medical condition, his finger injury was immediately treated, he was seen by an orthopedic specialist, his failure to receive hand surgery does not rise to the level of deliberate indifference, and his failure to receive his medication on certain isolated occasions does not

constitute an objectively serious medical condition. Consequently, Oliphant cannot establish that any of the Defendants acted with deliberate indifference towards him. None of the Defendants, to the extent that they had any responsibility for Oliphant's treatment, was aware of an objectively serious medical condition that they then consciously disregarded. Furthermore, none of the Defendants was personally involved in any of the alleged violations of Oliphant's constitutional rights, thus precluding a finding of liability under 42 U.S.C. § 1983. Therefore, Oliphant cannot make out a claim of deliberate indifference towards his medical needs in violation of the Fourteenth Amendment's Due Process Clause pursuant to 42 U.S.C. § 1983 with respect to any of the individually named Defendants. The Defendants are consequently entitled to judgment as a matter of law in their favor on each of Oliphant's claims.

## IV.  Conclusion

For the reasons set forth above, Plaintiff Gary Oliphant's Motion for Summary Judgment is denied. The Defendants have demonstrated that they are entitled to judgment as a matter of law in their favor on all of Oliphant's claims and accordingly Dr. Dunlap's, Physician's Assistant Patel's, and Nurse McGhee's Joint Motion for Summary Judgment is granted.

Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: September 4, 2012

23